## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) BRADLEY WATERS and BRYAN
WATERS, as Co-Personal Representatives
of the Estate of BRENT WATERS,
deceased,

            Plaintiffs,

vs.

(1) CITY OF ALTUS, OKLAHOMA,
(2) DOES ## 1-5
(3) SHERIFF ROGER LEVICK, in his
Official Capacity,
(4) THOMAS HOBBS,
(5) JACOB PARSONS,
(6) JENNIFER L. HAZLEWOOD,

            Defendants.

Case No. CIV-21-865-HE

JURY TRIAL DEMANDED

ATTORNEYS LIEN CLAIMED

## COMPLAINT

**COME NOW**, the Plaintiffs, Bradley Waters and Bryan Waters ("Plaintiffs"), as Co-Personal Representatives of the Estate of Brent Waters ("Mr. Waters"), deceased, and for their causes of actions against the above-named Defendants, allege and state the following:

## PARTIES, JURSIDICTION AND VENUE

1.  Bradley Waters and Bryan Waters are individuals, residents of the State of Texas and Oklahoma County, Oklahoma, respectively, and Co-Personal Representatives of the Estate of Brent Waters. Bradley and Bryan are also brothers of decedent, Mr. Waters. The survival causes of action in this matter are based on violations of Mr. Waters' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2.  Defendant City of Altus, Oklahoma is a municipality located in Jackson County, Oklahoma. The City provides and employs the Altus Police Department ("APD").

3.   Defendant Roger LeVick ("Sheriff LeVick" or "Defendant LeVick") is, and was at all times relevant hereto, the Sheriff of Jackson County, Oklahoma, residing in Jackson County, Oklahoma and acting under color of state law. Sheriff LeVick is sued purely in his official capacity. It is well established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Begg*s, 563 F.3d 1082, 1091 (10th Cir. 2009). See also *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff LeVick in his official capacity, Plaintiffs have brought suit against Jackson County/Jackson County Sheriff's Office ("County" or "JCSO").

4.   Defendant Thomas Hobbs ("Officer Hobbs") was, at all times relevant hereto, acting under color of state law, and in the scope of his employment as a police officer for the City of Altus, Oklahoma. Officer Hobbs arrested Mr. Waters on September 13, 2019 and transported him to the Jackson County Jail ("Jail"). Officer Hobbs committed underlying violations of Mr. Waters' Constitutional rights, explained below in more detail.

5.   Defendant Jacob Parsons ("Officer Parsons") was, at all times relevant hereto, acting under color of state law, and in the scope of his employment as a police officer for the City of Altus, Oklahoma. Officer Parsons arrested Mr. Waters on September 13, 2019 and transported him to the Jail. Officer Parsons committed underlying violations of Mr. Waters' Constitutional rights, explained below in more detail.

6.   Defendant Jennifer L. Hazlewood, RN ("Nurse Hazlewood") was at all times relevant hereto, an employee and/or agent of Jackson County Memorial Hospital and an agent/ostensible agent of Jackson County, who was, in part, responsible for overseeing Mr. Waters' health and well-being, and assuring that Mr. Waters' medical/mental health needs were met. At all times pertinent,

Nurse Hazlewood was acting within the scope of her employment and under color of State law. Nurse Hazlewood is being sued in her individual capacity.

7.   Defendants DOES ## 1-5 ("DOE Defendants" or "Jailer Defendants") are employees of the JCSO who assisted in the booking of Mr. Waters at the Jackson County Jail. The DOE Defendants were, at all times relevant hereto, acting under color of state law, and in the scope of their employment as jailers/deputies for the JCSO.

8.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

9.   The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

11. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## STATEMENT OF FACTS

12. Paragraphs 1-11 are incorporated herein by reference.

13. On or about September 13, 2019, at approximately 8:00 a.m., Mr. Waters, a census worker from Dallas, Texas, was driving westbound on Falcon Road in Altus, Oklahoma, when APD Officer Thomas Hobbs initiated a traffic stop.

14. Officer Hobbs decided to initiate the stop after he observed Mr. Waters' Nissan Altima running up against the curb "almost hitting a pole." There were no other reasons to stop Mr. Waters' vehicle.

15. As he approached the vehicle, Officer Hobbs asked Mr. Waters for his driver's license. Mr. Waters immediately complied with Officer Hobbs' request. When asked for his car insurance, Mr. Waters was deliberate in his search for the proper form, and answered all of Officer Hobbs' questions in an orderly and reasonable manner. At no time during the traffic stop was it objectively or subjectively apparent that Mr. Waters was under the influence of alcohol or drugs.

16. When Officer Hobbs asked Mr. Waters why his vehicle had veered to the side of the road, Mr. Waters told him he "had hardly slept" and his windshield was foggy, which Officer Hobbs audibly agreed with.

17. When asked by Officer Hobbs whether he had taken any medications, Mr. Waters said no, besides "some Tylenol."

18. Officer Hobbs then went back to his patrol vehicle while Mr. Waters continued the search for his insurance documents. It was at this time that Officer Parsons appeared on the scene.

19. In describing the situation to Parsons, Hobbs told him, regarding the possibility of Mr. Waters being under the influence of drugs and/or alcohol, "***I don't smell anything. His eyes don't look bloodshot. He looks like he's just out of it.***"

20. Indeed, at 8:13 a.m., approximately 13 minutes after the traffic stop was initiated, Mr. Waters told the officers that he "just need[ed] to sleep" and that he had been awake for 25 hours due to difficulty sleeping the night before. In doing so, Mr. Waters provided the Defendant Officers with a logical and reasonable explanation for his demeanor, behavior and actions.

21. Nevertheless, the Defendant Officers arbitrarily refused to believe that Mr. Waters was sleep deprived. Officer Parsons continued to aggressively question Mr. Waters and concluded that

4

because his eyes were purportedly "dilated," he was under the influence of marijuana. However, as explained, *infra*, Mr. Waters was suffering from an emergent medical condition(s) which easily explained the supposed dilation in his eyes and the lethargy in his movements.

22. At approximately 8:15 a.m., Officer Parsons asked Mr. Waters for permission to search the vehicle, which he agreed to.

23. In doing so, Mr. Waters exited his car and walked towards Officer Hobbs. Mr. Waters had difficulty walking at this time. At one point, he stumbled into the back of his car. This was a clear indication that something was wrong with Mr. Waters. When Hobbs asked him if he was okay, Mr. Waters responded, "I just need to sleep." In refusing to listen to or assist Mr. Waters, the Defendant Officers were deliberately indifferent to his obvious and serious medical needs.

24. During the time Officer Parsons was searching the vehicle, Mr. Waters was attempting to answer questions posed by Officer Hobbs. He asked to sit down, which Hobbs allowed him to do on the front of his patrol vehicle. During Hobbs' questioning, Mr. Waters was so weak that he could not even hold his head up. He had difficulty verbally responding to the questions. He appeared confused and disoriented. He was visibly short of breath. Still, the Defendant Officers did nothing to medically assist Mr. Waters. By continually disregarding the obvious signs and symptoms of a serious medical condition(s), Defendant Officers acted with deliberate indifference to Mr. Waters' needs and Constitutional rights.

25. At approximately 8:16 a.m., while the vehicle search was ongoing, Hobbs asked Mr. Waters ***"are you sure you don't need the EMT's to come check on you?"*** Hobbs asked multiple times if Mr. Waters needed an EMT, indicating his awareness of Mr. Waters' medical distress. Yet, after Mr. Waters did not provide a verbal reply, Hobbs continued to disregard the substantial risks to Mr. Waters' health and safety.

26. After completing the search of Mr. Waters' vehicle and finding no illicit substance or alcohol, Officer Parsons decided to conduct a field sobriety test of Mr. Waters via Horizontal Gaze Nystagmus Test ("HGN"). HGN is the involuntary jerking of one's eye when it gazes to the side. Since this jerking becomes exaggerated by alcohol consumption, it is used as evidence of impairment in DUI cases. Officer Parsons acknowledged, on the scene, that Mr. Waters had **"no odor of alcohol"** and **"no HGN"**. There was also no odor of marijuana. By this point, it was abundantly clear that Mr. Waters was not under the influence of any intoxicating substance, and was in medical distress. Yet, in deliberate indifference to Mr. Waters' serious medical needs, the Defendant Officers provided and secured no medical assistance for Mr. Waters and proceeded to treat him as criminal, despite the utter lack of evidence.

27. Parsons concluded that Mr. Waters was under the influence of marijuana, despite that fact that Mr. Waters' condition was not consistent with marijuana impairment.

28. Rather than call an ambulance, Parsons next attempted to subject Mr. Waters to a "walk and turn" test, which Mr. Waters could not complete due to his extreme fatigue, weakness, and other emergent health issues. Again, Mr. Waters was in such a state of distress that he was incapable of holding his head up for more than a few seconds. He was lethargic in the extreme, and incapable of walking on his own power to even begin, let alone complete, the "walk and turn" test. Once again, it would have been obvious, even to a layperson, that Mr. Waters was in need of an emergent medical assessment and treatment. Yet, once again, the Defendant Officers failed to provide or secure any medical assistance for Mr. Waters, in deliberate indifference to his serious medical needs.

29. Taken together -- despite Mr. Waters' supposed initial traffic violation(s) -- the facts that Mr. Waters a) hadn't slept in 25 hours; b) hadn't eaten anything the morning of September 13, 2019; c) had a foggy windshield (which Hobbs audibly corroborates on bodycam footage); d) wasn't

on any medications; e) had no illegal, illicit, or intoxicating substances found on his person or in his car; f) did not smell of alcohol or marijuana; g) had no HGN; and g) appeared to be in medical distress, constitute a lack of probable cause to arrest Mr. Waters for driving under the influence of alcohol and/or drugs ("DUI").

30. The patent unreasonableness of concluding Mr. Waters was intoxicated notwithstanding, after Mr. Waters could not continue with the walk and turn test, Officer Hobbs proceeded to *handcuff* Mr. Waters, not read him any *Miranda* rights, and place against his patrol vehicle. As before, Mr. Waters was incapable of standing up and was so weakened that he had to rest his head on the side of the car.  At another point, Mr. Waters lost control of his body, and collapsed against the squad car. This was yet another obvious indication that Mr. Waters needed emergent medical attention. And yet again, the Defendant Officers provided no assistance, in deliberate indifference to Mr. Waters' serious medical needs.

31. Defendant Hobbs read Mr. Waters instructions for the State's official blood test for intoxicating substances, which Mr. Waters agreed to. Defendant Officers never offered Mr. Waters a breathalyzer test (as they knew he was not under the influence of alcohol) or any other method to analyze his supposed intoxication at the scene of the arrest. A Drug Recognition Expert ("DRE") was never called to the scene while Mr. Waters was there.

32. Hobbs subsequently moved Mr. Waters to Officer Parsons' patrol vehicle so that he could complete paperwork. Parsons then drove Mr. Waters to the Jackson County Memorial Hospital ("Hospital") to complete the blood draw for intoxicating substances.

33. Defendant Hobbs stayed at the scene of the original traffic stop to complete paperwork related to Mr. Waters' vehicle. Only then was a DRE called to the scene of the arrest, during which Officer Hobbs described what had happened **without Mr. Waters present** and **without the**

***DRE evaluating Mr. Waters' condition(s) for himself.*** Never once did the DRE see Mr. Waters until he began the booking process at the County Jail.

34. After arriving at the Hospital at approximately 8:38 a.m., Parsons brought Waters into an emergency room to have his blood drawn. Inexplicably, Parsons' "bodycam" footage stops at the moment they enter the Hospital.

35. Despite the knowledge that Mr. Waters exhibited multiple obvious signs and symptoms of serious medical need, Officer Parsons did not inform the medical staff at the Hospital nor request that they provide any medical assessment or treatment. Instead, despite the ready availability of medical professionals, Officer Parsons informed the Hospital staff that Mr. Waters was only there for a "blood draw." Officer Parsons' failure to inform the nursing staff of Mr. Waters' condition or even request a medical assessment is yet another instance of deliberate indifference to a serious medical need.

36. Upon information and belief, it was Nurse Hazlewood who saw Mr. Waters to draw blood for his toxicology test. She also completed an "RN Assessment" at 8:48 a.m. during which she completed ***no actual assessment*** of Mr. Waters' health. Pertinently for the causes of actions described herein, there was a section of the RN Assessment form on which Nurse Hazlewood should have recorded Mr. Waters' vital signs, medical history, and other health information which would have revealed Mr. Waters' dire condition(s), but it was never filled out. Based on Mr. Waters' condition, including extreme lethargy, unsteady gait, disorientation and weakness, it would have been obvious to Nurse Hazlewood that Mr. Waters needed an immediate medical assessment. However, based on the empty form, Nurse Hazelwood failed to conduct the most basic medical assessment of Mr. Waters, in deliberate indifference to his serious medical needs.

37. Upon information and belief, Nurse Hazlewood ***never assessed*** Mr. Waters' vital signs or medical history. Given Mr. Waters' condition, along with his alleged intoxication, Nurse

Hazlewood knew, or it was obvious, that a complete medical assessment of Mr. Waters was necessary to evaluate his well-being and clearance for transport to the Jackson County Jail. However, she did no such thing, with deliberate indifference to Mr. Water's obvious and emergent medical needs.

38. At approximately 8:56 a.m., Officer Hobbs arrived at the Hospital and joined Mr. Waters and Parsons in the emergency room, with no medical personnel present.

39. "Bodycam" footage, from Officer Hobbs, continues at this point. Mr. Waters' blood tests had already been taken, and no further medical assessment(s) were being performed for Mr. Waters. Mr. Waters' condition was clearly going from bad to worse. Mr. Waters was unconscious on an examination table, and still unable to hold his head up when asked to stand.  Yet, Officer Hobbs did not request a medical assessment from any of the nurses right outside the door of the exam room. This was also deliberate indifference to a serious medical need.

40. Mr. Waters' Hospital records indicate that he was "unavailable for signature" and that he "CAME IN INTOX..COULD NOT SIGN N [sic]." Upon information and belief, Mr. Waters' illness was so severe that he was unable to sign his name on his outpatient registration form. Despite Mr. Waters' obviously serious medical condition that required immediate assessment and treatment, neither Nurse Hazlewood nor the Defendant Officers did *anything* to help him, in deliberate indifference to his serious medical needs.

41. At approximately 9:04 a.m., Defendant Officers led Mr. Waters out of the Hospital, inexplicably *in handcuffs*, and began to transport him to the Jail.

42. Upon information and belief, Defendant Officers **had not received the results of Mr. Waters' toxicology test** when they transferred him from the Hospital to the Jail. The toxicology test came out negative. Thus, had the Defendants Officers only waited mere minutes for these

results, they would have discovered Mr. Waters was indeed *not* intoxicated, as he professed at the scene of the arrest, but rather in the grips of a dire medical episode.

43. In the alternative, if the Defendant Officers had the toxicology results at the time of transport, which provided objective proof that he was not under the influence of any intoxicating substance, their decision to take him to the Jail for booking was even more reckless.

44. As the booking process began at the Jail, Mr. Waters struggled to stand, could not hold his head up and was observed standing with his hands on his knees. Jail staff were alerted to these signals of distress, yet did nothing about it and continued the booking process as though nothing was amiss. This utter lack of evaluation or care constitutes deliberate indifference to Mr. Waters' obvious and emergent medical needs.

45. At approximately 9:12 a.m., Mr. Waters was placed in an interrogation room.

46. At approximately 9:15 a.m., Mr. Waters collapsed and/or fell from the chair he was sitting in, causing a laceration on his left ear.

47. Emergency Medical Services ("EMS") were called to the Jail where they noted "Upon arrival, found a 56 year old male in an interrogation room, supine on the floor, with CPR in progress. He was brought out to the booking area and CPR continued." Unfortunately, their efforts were unsuccessful.

48. EMS transported Mr. Waters' body back to the Hospital, but his pulse was unable to be revived. He was confirmed to be dead when he was "discharged" from the Hospital again at approximately 10:15 a.m.

49. The official report from the Office of the Chief Medical Examiner ("OCME") indicates the official time of death at 10:05 a.m. from "atherosclerosis of the left main artery," consistent with cardiac arrest.

50. "Hyperglycemia" was also listed by the OCME as an "other significant cause" ("OSC") of Mr. Waters' death. Indeed, Mr. Waters' Hospital records indicate that his **Finger Stick Blood Sugar ("FSBS") result was 1080 mg/dl, over ten times what is considered normal**.

51. Mr. Waters' extremely high blood sugar indicates that he was likely suffering from hyperosmolar hyperglycemic syndrome ("HHS"). According to the Cleveland Clinic[1], HHS occurs when a person suffers from extremely high blood sugar that is not timely treated. Signs and symptoms of HHS include: blood sugar over 600 mg/dl; confusion, hallucinations, drowsiness or passing out; dry mouth and extreme thirst that may eventually get better; blurred vision; and weakness or paralysis. HHS can lead to severe dehydration and a heart attack. Treatment for HHS includes fluids for hydration, electrolytes to balance the minerals in a person's body, and insulin to control blood sugar.

52. Mr. Waters was clearly suffering from several of these symptoms – such as confusion, drowsiness, and weakness/fatigue – throughout all of his interactions with the Defendant Officers, Nurse Hazlewood, and the staff at the Jail.

53. The obvious signals of medical distress Mr. Waters displayed, coupled with the lack of evidence associated with his DUI arrest, put the Defendants on notice of the serious and obvious risks to Mr. Waters' health and well-being.

54. Indeed, Mr. Waters informed Officers Hobbs and Parsons on multiple occasions throughout his initial arrest that he was experiencing extreme fatigue. He also outwardly displayed confusion, extreme fatigue, muscle weakness and inability to walk without assistance.

55. By disregarding these known and obvious signs and symptoms of severe illness, and instead *arresting and handcuffing* Mr. Waters for alleged DUI, and by repeatedly failing to secure any medical

---

[1] https://my.clevelandclinic.org/health/diseases/21147-hyperosmolar-hyperglycemic-syndrome (Last accessed on June 10, 2021).

assistance for Mr. Waters, Officers Hobbs and Parsons were deliberately indifferent to Mr. Waters'
health and well-being.

56. Upon information and belief, Nurse Hazlewood observed and drew blood from Mr.
Waters, and despite his obvious need for further monitoring, assessment, and treatment, she
cleared him to be transported to the Jail, in deliberate indifference to his serious medical needs.

57. Both Jackson County Hospital Records and the OCME report confirmed ***there was no
alcohol or drugs*** in Mr. Waters' system at the time of his death.

## CAUSES OF ACTION

### I.

### DENIAL OF MEDICAL TREATMENT IN VIOLATION
### OF THE FOURTEENTH AMENDMENT TO THE
### UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

**A. Officers Hobbs and Parsons**

58. Paragraphs 1-57 are incorporated herein by reference.

59. From the time Officers Hobbs and Parsons indicated their intent to arrest Mr. Waters until
he arrived at the Jail, Mr. Waters was a detainee in the custody of Officers Hobbs and Parsons and
APD.

60. Mr. Waters had medical needs that were sufficiently serious, objectively, to be of a
Constitutional dimension.

61. Mr. Waters had serious medical needs that were known or obvious.

62. As described above, Officers Hobbs and Parsons knew -- or it was obvious -- that Mr.
Waters was at substantial risk of serious harm.

63. Officers Hobbs and Parsons disregarded these known and obvious risks in deliberate
indifference to Mr. Waters' serious medical needs.

64. It was obvious that Mr. Waters needed an immediate and emergent medical evaluation and treatment from a physician, or other qualified medical professional, but such services were denied, delayed and obstructed.

65. Under the circumstances, Officers Hobbs and Parsons had a duty and obligation to ensure that Mr. Waters received treatment or access to medical personnel capable of evaluating the need for treatment. They did neither, in deliberate indifference to Mr. Waters' serious medical needs.

66. Officers Hobbs and Parsons were also deliberately indifferent under a purely objective standard of liability. That is, Officers Hobbs and Parsons did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Waters.

67. As a direct and proximate result of this deliberate indifference, as described above, Mr. Waters experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

68. As direct and proximate result of Officers Hobbs and Parsons' conduct, Plaintiffs are entitled to pecuniary and compensatory damages. Plaintiffs are entitled to damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

69. Plaintiff is also entitled to an award of punitive damages as the conduct of Officers Hobbs and Parsons constitutes reckless disregard for Mr. Waters' federally-protected rights.

**B. Nurse Hazlewood**

70. Paragraphs 1-69 are incorporated herein by reference.

71. As described, *supra*, Nurse Hazlewood knew, or it was obvious, that there were substantial risks to Mr. Waters' health and safety.

72. It was obvious that Mr. Waters needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed.

13

73. Nurse Hazlewood provided Mr. Waters with no medical assistance in the face of his obvious, significant and emergent needs.

74. Nurse Hazlewood disregarded the known, obvious and substantial risks to Mr. Waters' health and safety.

75. Nurse Hazlewood was also deliberately indifferent under a purely objective standard of liability. That is, Nurse Hazlewood did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Waters.

76. As a direct and proximate result of this deliberate indifference, as described above, Mr. Waters experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

77. As direct and proximate result of Nurse Hazlewood's conduct, Plaintiffs are entitled to pecuniary and compensatory damages. Plaintiffs are entitled to damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

**C. Jail Staff/Underlying Violations**

78. Paragraphs 1-77 are incorporated herein by reference.

79. The Jailer Defendants knew -- or it was objectively obvious -- that there were substantial risks to Mr. Waters' health and safety.

80. Mr. Waters had serious medical needs that were known or obvious.

81. As described, *supra*, Mr. Waters had serious and emergent medical issues that were known and/or obvious to the Jailer Defendants. It was obvious that Mr. Waters needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and/or obstructed. Indeed, Mr. Waters was not medically evaluated whatsoever when he arrived

at the Jail. Jail staff disregarded the known, obvious and substantial risks to Mr. Waters' health and safety.

82. Under the circumstances, Jail staff had a duty and obligation to assure that Mr. Waters received treatment or access to medical personnel capable of evaluating the need for treatment. Instead of immediately sending Mr. Waters to the Hospital upon his arrival at the Jail, the Jailer Defendants began the booking process, in deliberate indifference to Mr. Waters' serious medical needs.

83. The Jailer Defendants were also deliberately indifferent under a purely objective standard of liability. That is, the Jailer Defendants did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Waters.

84. As a direct and proximate result of this deliberate indifference, as described above, Mr. Waters experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

85. As direct and proximate result of Jailer Defendants' conduct, Plaintiffs are entitled to pecuniary and compensatory damages. Plaintiffs are entitled to damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

**D. Official Capacity Liability (Against Sheriff LeVick)**

86. Paragraphs 1-85 are incorporated herein by reference.

87. The County/JCSO/Sheriff LeVick failed to provide constitutionally sufficient medical training and supervision to Jail staff for the identification assessment, evaluation, and treatment of serious medical conditions suffered by inmates at the Jail.

88. The aforementioned acts and/or omissions of the Jailer Defendants in being deliberately indifferent to Mr. Waters' health and safety are causally connected with customs, practices, and/or

policies which the County/JCSO/Sheriff LeVick promulgated, created, implemented and/or possessed responsibility for.

89. Such policies, customs and/or practices include, but are not limited to:

a. A failure to train Jail staff on how to conduct a proper medical intake for newly booked inmates;

b. A failure to train Jail staff on how to recognize and respond to an inmate's emergent medical condition;

c. A failure to train Jail staff to ensure that arrestees arriving to the Jail exhibiting signs of suffering from an obvious and serious medical condition or intoxication, like Mr. Waters, are properly cleared by a medical professional for booking into the Jail;

d. A practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions;

e. A failure to refer inmates with obviously serious medical conditions to outside medical professionals;

f. An utter lack of physician supervision over the clinical care provided to inmates;

g. An utter failure to supervise the medical care and monitoring of inmates with serious medical conditions; and

h. A failure to staff the Jail with personnel capable of assessing, evaluating or treating the serious medical needs of inmates like Mr. Waters.

90. Pursuant to the polices, customs, and/or practices listed above, Mr. Waters: was not medically cleared before being booked into the Jail, did not receive an adequate medical intake, was not placed on any protocols that would ensure he was monitored more closely due to suffering from a serious medical condition, and was never seen by any medical professional while he was at the Jail despite his obvious symptoms of a serious medical condition. Indeed, it was so obvious that Mr. Waters needed emergent medical treatment, Jail staff should have immediately sent him to the Hospital instead of initiating the booking process.

91. The risks to inmates like Mr. Waters presented by the maintenance of such a deficient medical delivery system were substantial and obvious such that County/JCSO/Sheriff LeVick should have known them.

92. The County/JCSO/Sheriff LeVick failed to take reasonable measures to alleviate those risks.

93. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Waters suffered injuries and damages as alleged herein. Plaintiffs are entitled to pecuniary and compensatory damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

**E. Municipal Liability (City of Altus)**

94. Paragraphs 1-93 are incorporated herein by reference.

95. There is an affirmative link between the deprivation of Mr. Waters' constitutional rights and APD policies, practices and/or customs which the City of Altus promulgated, created, implemented and/or possessed responsibility for.

96. On information and belief, APD/the City of Altus has utterly failed to train and supervise APD officers with respect to recognizing the signs and symptoms of serious medical conditions.

97. On information and belief, APD/the City of Altus has utterly failed to train and supervise APD officers on how to distinguish the symptoms of drug and/or alcohol intoxication with the symptoms of a serious medical condition.

98. On information and belief, APD/the City of Altus has utterly failed to train and supervise APD officers to ask medical personnel that conduct toxicology screens on arrestees suspected of being under the influence to check for any underlying conditions, even when the arrestee, like Mr. Waters, has symptoms of a medical condition and/or reports being sick.

99. On information and belief, APD/the City of Altus has utterly failed to train and supervise APD officers on when to transport arrestees to an outside medical provider to receive treatment for a serious medical condition.

100. APD/the City of Altus should have known that this failure to train and supervise was substantially certain to result in Constitutional violations.

101. The failure to train and supervise provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Mr. Waters' civil rights and the resulting injuries alleged herein.

102. As a direct result of Officers Hobbs and Parsons'/the City's conduct, Mr. Waters suffered serious actual physical and emotional injuries, death, and other damages and losses as described herein entitling Plaintiffs to pecuniary and compensatory damages in amounts to be determined at trial. Plaintiffs are entitled to damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

## II.

### WRONGFUL ARREST IN VIOLATION OF THE FOURTH AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)
### (Against Officers Hobbs and Parsons)

103. Paragraphs 1-102 are incorporated herein by reference.

104. In determining the existence of probable cause, Courts are required to include exculpatory evidence that was omitted or suppressed by law enforcement.

105. When one considers the evidence that was omitted, ignored or suppressed by Defendants Hobbs and Parsons, there was plainly no probable cause for the arrest of Mr. Waters.

106. Officers Hobbs and Parsons observed no odor of alcohol or drugs on Mr. Waters and failed to uncover any evidence of drugs and/or alcohol in Mr. Waters' vehicle. In contrast to Officers Hobbs and Parsons' conduct, Mr. Waters' outwardly displayed signs of a serious medical condition yet the Officers arrested him in the absence of probable cause.

107. Officers Hobbs and Parsons admitted that Mr. Waters displayed no signs of intoxication other than being "out of it," yet they still arrested him for driving under the influence.

108. This wrongful arrest lacked probable cause, as required by the Fourth Amendment, as applied to the States by the Fourteenth Amendment. This wrongful arrest violated Mr. Waters' Fourth Amendment right to be secure against unreasonable seizure and violated Mr. Waters' Fourth Amendment-protected sense of security and individual dignity.

109. This wrongful arrest was a proximate cause of Mr. Waters' prolonged imprisonment, exacerbated physical injuries, emotional distress, pain and suffering, ultimate death, and the damages as alleged herein.

**Municipal Liability (City of Altus)**

110. Paragraphs 1-109 are incorporated herein by reference.

111. There is an affirmative link between the deprivation of Mr. Waters' constitutional rights and APD policies, practices and/or customs which the City of Altus promulgated, created, implemented and/or possessed responsibility for.

112. Upon information and belief, APD/the City of Altus has failed to adequately train and supervise its officers in how to determine probable cause for an arrest, particularly for "DUI-Drug" arrests.

113. APD/the City of Altus has failed to adequately train and supervise its officers in how to recognize the signs and symptoms of someone driving under the influence of alcohol and/or drugs.

114. On information and belief, APD/the City of Altus has failed to adequately train and supervise APD officers on how to distinguish the symptoms of drug and/or alcohol intoxication from the symptoms of a serious medical condition.

115. On information and belief, APD/the City of Altus has failed to adequately train and supervise APD officers how to consider exculpatory evidence when determining whether there is probable cause to arrest someone for driving under the influence.

116. APD/the City of Altus should have known that this failure to train and supervise was substantially certain to result in Constitutional violations.

117. The failure to train and supervise provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Mr. Waters' civil rights and the resulting injuries alleged herein.

118. As a direct result of the City's conduct, Mr. Waters suffered serious actual physical and emotional injuries, death, and other damages and losses as described herein entitling Plaintiffs to pecuniary and compensatory damages in amounts to be determined at trial. Plaintiffs are entitled to damages due to the deprivation of Mr. Waters' rights secured by the U.S. Constitution.

**WHERFORE**, based on the foregoing, Plaintiffs pray this Court grant the relief sought, including but not limited to actual and compensatory damages and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen

20

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryondhelm@ssrok.com

***Attorneys for Plaintiff***